IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL HOME LOAN ) <br> MORTGAGE CORPORATION ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MM PROPERTY LLC, *et al*. ) <br> ) <br> Defendants. ) <br> ) | Case No. 1:23-cv-01642 |

## RECEIVER'S STATUS REPORT

Marc E. Albert, Court-appointed receiver ("Receiver"), by counsel, submits the following Status Report as ordered by the Court on June 30, 2023. On June 30, 2023, the Court entered a Consent Order (the "Receivership Order") [ECF Dkt. No. 21] appointing Marc Albert as receiver for the property known as Mayfair Mansions III located at 3743-3817 Jay Street NE, Washington, DC (the "Property"). The Property is comprised of a 160-unit apartment complex located in the southeast quadrant of Washington, DC, and, prior to the appointment of the Receiver, was both owned and operated by defendant MM Property LLC and its principal Scott Forrester ("Mr. Forrester").

Paragraph 18 of the Receivership Order provides that the "Receiver shall from time to time, but at least on a monthly basis, provide the Court, Freddie Mac and to all counsel in this case a report of the Receivership Estate, including all receipts and expenditures of and by the Receiver, the Receiver's activities at and in regard to the Property, and the condition of the Property (each a "Receiver Report.")." Receivership Order at ¶ 18. The following report supplements the previous Receiver's Status Reports filed to-date in the case.[1]

---

[1] *See* ECF Dkt. Nos.26, 28, 33, 38, 40, 44, 48, 59, 67, 69, 71, 72, 73, 76, 82, 85, 87, 88, and 89.

**Property Management January 2025 Monthly Operational Summary Report Accrual**

As reported in the Receiver's initial report to the Court, the Receiver has employed Mario Lloyde ("Mr. Lloyde") and Noble Realty Advisors, LLC ("Noble" or "Property Manager") to serve as the Receiver's property manager for the Property to oversee day-to-day operations and rehabilitation efforts. Noble's services to the Property commenced immediately upon the Effective Date of the Receivership on July 1, 2023. As part of Noble's services to the Receiver, they are to prepare and submit to the Receiver monthly reports of their efforts and provide relevant financial information concerning the income and expenses seen at the Property (each a "Noble Report"). In that respect, Noble has recently prepared and submitted to the Receiver its Monthly Operating Summary Report Accrual for the month of January 2025, a copy of which is attached hereto as **Exhibit A.**

As seen in the January 2025 Noble Report, income collected during the month totaled $115,969.10 from rents derived from the Property and other deposits.[2] Actual disbursements for the month of January 2025 from Noble totaled $220,036.59[3], leaving a reconciled cash balance in Noble's operating account with John Marshall Bank of $78,644.90 as of January 31, 2025. Noble's security deposit account with John Marshall Bank has an available and reconciled cash balance of $247.021 as of January 31, 2025. In addition to the income into Noble's property management accounts at John Marshall Bank, the Receiver is also submitting with this Receiver Report the deposit and disbursement log for his accounts maintained at Axos Bank through February 28, 2025, attached hereto as **Exhibit B**. During January 2025, there were five

---

[2] The summary sheet provided on page 2 of the Noble report provides that income received during the month totaled $248,969.10. This figure includes the $133,000 in funds transferred to Noble by the Receiver from his accounts for use at the Property.

[3] These amounts do not include disbursements for Receiver fees and fees of the Receiver's counsel which were completed directly from the Receiver's accounts and reflected on the attached Exhibit B.

disbursements made from the Receiver's operating account: $133,000.00 in funds delivered by the Receiver to Noble for use at the property; two tax payment to the U.S. Treasury totaling $5,820.81; $8,416.50 to the Receiver for professional services and disbursements rendered through December 31, 2024; and $7,339.50 to Stinson LLP for fees and expenses as the Receiver's counsel through December 31, 2024. No deposits were received into the Receiver's operating account for January 2025. The reconciled cash balance in the Receiver's operating account as of January 31, 2025 was $251,835.37. The Receiver additionally received and is maintaining funds presently earmarked as tenant security deposits totaling $94,971.24 in a separate interest bearing account at Axos Bank. The Receiver also maintains a reserve account ending in 0414. There were no transactions in this account. The balance of this account is $0.00.

In addition to actual disbursements from the various accounts maintained by Noble and those maintained exclusively by the Receiver, expenses either incurred or booked for the Property for January 2025 totaled $99,875.84[4]. This amount does not include monthly payments that are continuing to accrue towards the Property's secured debt owing to Freddie Mac, which until the Property is financially stabilized, monthly payments towards Freddie Mac will likely continue to go unpaid.

Outstanding booked payables as of January 31, 2025 for the Property totaled $622,202.38.[5] These payables include both current payables booked since the inception of the receivership, as well as payables known to Noble that were incurred prior to the receivership. Noble has provided a sorted payables list, attached as **Exhibit C**, indicating payables for known pre-receivership non-

---

[4] Because Noble operates their books for the Property on an accrual basis, this amount does not reflect expenses solely incurred during the month of January 2025. Noble received invoices for work and services incurred at the Property prior to January 2025 during the month that were booked into Noble's records for the reporting period.
[5] Again, this value does not include monthly amounts accruing for the Property's secured debt, which is going unpaid through the pendency of the Receivership.

3

utility items totaling $181,969.47[6], payable values for non-utility items incurred since the inception of the Receivership totaling $207,906.42, and payable values for utility items incurred pre-receivership through January 2025 totaling $232,326.49[7].

**Conditions at the Property**

As previously reported by the Receiver, Noble prepared a comprehensive report on the conditions at the Property, which was included in the Receiver's previous report filed on October 30, 2023. (Receiver's Status Report, Ex. D [ECF Dkt. No. 38]). Since that report, Noble has slowly been making repairs to vacant units at the Property and common areas with available funds collected from rent received from the Property and received reserve funds, while continuing to address general ongoing maintenance from tenant repair and maintenance requests as they are received. As previously reported, at current operational levels and with additional received funding into the Receivership, Noble is presently generally able to address tenant maintenance and repair requests for the currently occupied units as they arise, but not without cost and funds of the Receivership are depleting over time. If the Property were to be operating outside of the present receivership (including the need to pay the monthly secured debt at the Property), the month-to-month rental income collections would not sustain the Property's operations and the Property would be operating at a significant, severe shortfall. Presently the Receivership is only able to operate through (1) deferring the Property's secured debt payments, and (2) use of the various reserve funds and cash advances from Freddie Mac it has received to date.

---

[6] The value of the booked pre-receivership payables does not at this time include a value attributed to Tempo Inc. t/a Annapolis Painting Services, Inc. ("Tempo"). Tempo has made attempts to assert a mechanic's lien against the Property and has filed a Complaint in the DC Superior Court (Case No. 2023-CAB-004257) against the Property for unpaid work Tempo did at the Property pre-receivership totaling $520,403.49. On February 7, 2024, the Receiver filed his *Receiver's Motion to Stay State Court Litigations over Pre-Receivership Claim*, seeking issuance of a stay of this matter based on the Receivership Order. On May 21, 2024, the Court issued its Order granting the Receiver's motion enjoining further action in the Tempo State Court litigation.

[7] This balance includes the full amount currently known to Noble that is owed to DC WASA and Pepco for utility services. The majority of these charges, however, were for charges incurred prior to the receivership.

4

Of the 160 units at the Property, the units may generally be classified into four categories: (A) Occupied Units – those units presently occupied by leased tenants; (B) Leased Vacant Units – fully repaired but presently vacant units that have been assigned to either a fully approved tenant lease or are waiting for final voucher approval from a corresponding agency for move-in; (C) Unleased Vacant Units - vacant units either ready for tenant move-in or could be made ready with relatively minor repairs, but not assigned to an existing pending tenant lease; and (D) Down Units – seven units at the Property that are presently gutted and will require significant rehabilitation time and cost to be brought back online for tenant use. The present makeup of the units at the Property is as follows:

        **A. Occupied Units:**        **118**

        **B. Leased Vacant Units:**        **7**

        **C. Unleased Vacant Units**        **28**

        **D. Down Units**        **7**

Since the Receiver's last monthly report, Noble successfully completed four tenant move-ins to vacant units at the Property from its existing approved applicant pool. Noble expects three more move-ins in early March 2025. Further, while Noble has been successfully moving in new tenants into the Property, the overall vacancy rate at the Property has stayed relatively consistent due to several evictions and agreed move-outs at the Property of existing tenants during the same period. The loss of these tenants, however, largely should help to increase the financial stability of the Property over time, as the tenants that have either agreed or been forced to leave the Property through the DC Superior Court's eviction process generally have not been paying rent. As non-paying tenants are replaced with capable rent paying tents over time, monthly rental collection should continue to increase and the Property hopefully will see larger increases in both collected

rent and vacancy rate reductions once the existing occupied units become filled with rent-paying tenants and move-ins at the Property to vacant units begin to serve as true additions to the Property tenancy instead of replacements for evicted tenants. Ensuring new tenants at the Property are capable of fulfilling their rent obligations through the extensive application process also is an important factor in this process.

With respect to the existing vacant units (both leased and unleased), seven (7) in total (5 Leased and 2 Unleased) are currently rehabilitated and have been made ready for a tenant move-in. Noble is currently waiting on two (2) units to be inspected by DC Housing Authority. Turnover of two units is expected to be completed by early February 2025. The remaining twenty-eight (28) unleased vacant units will require some degree of rehabilitation to be made-ready for tenant use at a cost of approximately $2,000 - $5,000 per unit. Noble intends to expend funds to complete repairs in these units on a rolling basis as it receives lease applicants that meet its internal approval metrics and, if necessary, appear to be able to meet the approval guidelines necessary to receive HAP funds with the appropriate District agencies. The HAP voucher approval process, including unit inspection, typically takes approximately eight weeks for the tenant to be approved to move into the Property. Following that approval, there may be further delay before the tenant is able to fully move in to the Property due to the tenant needing to provide proper notice to his or her current landlord of their intention to move out of their leased premises. Noble is continuing its rehabilitation and marketing efforts to rent the other available units at the Property to stabilize monthly operations, with their efforts expected to continue in the coming months to decrease the vacancy rate at the Property

.

6

**Update Regarding 2021 Compliance Audit**

As previously reported, following the *Receiver's Motion Requesting Authority to File Income and Franchise Tax Returns on Behalf of Owner, and (2) Requesting Hearing Related to Owner Execution of Documents Necessary to Complete Compliance Audit and Compelling Owner Attendance* filed by the Receiver on August 2, 2024 [ECF No. 74] (the "Audit Motion"), and a hearing held on matters raised in the Audit Motion on September 23, 2024, the Court entered an Order regarding the Audit Motion on September 30, 2024 [ECF No. 81]. In the Order, the Court required Scott Forrester and David Forrester to work in good faith with the accounting firm PKF O'Connor Davies ("PKFOD") in an attempt to agree by October 23, 2024, upon appropriate responses to PKFOD's Fraud Risk Questionnaire, ECF NO. 74-2, and management representation letter, ECF No. 74-3. *See* ECF No. 81 ("Order") at 1. The Order further required that the Receiver provide the Court with a status report updating the Court as to the status of the Forresters' discussions with PKFOD and the progress made toward completing the 2021 compliance audit, and, if not yet completed, a proposal for next steps. *Id.*

The Receiver filed his initial status report on these matters on October 24, 2024, where the Receiver reported that progress was being made but that the audit was not yet complete. See Receiver's Status Report Regarding Compliance Audit [ECF No. 84]. Specifically, the Receiver reported that both David Forrester and Scott Forrester had submitted signed submissions of the Fraud Risk Questionnaire, and that, at that time Scott Forrester was intending to provide his comments to the management representation letter to PKFOD by October 29, 2024. Following the Receiver's initial report, he has periodically provided updates to the Court on the progress made regarding the 2021 Compliance Audit and the status of the Forresters' cooperation.

7

The Receiver can now report that both Scott Forrester and David Forrester appear to have completed the work needed by them to complete the 2021 Compliance Audit. Following several rounds of revisions to the representation letter between Scott Forrester and PKFOD and further review by Mr. Forrester of remaining information concerning the audit, Scott Forrester delivered a signed copy of an agreed representation letter to the Receiver and PKFOD on February 14, 2025. This signed letter was subsequently provided to David Forrester along with the audit package for his review. David Forrester returned a signed copy of the personal representation letter to the Receiver on February 28, 2025. Having just received the signed letter from both Forresters, the Receiver is taking steps to complete full finalization of the audit with PKFOD and expects it to be fully completed in short order.

**Continued Need for Tempo Injunction**

Previously, Tempo Inc. t/a Annapolis Painting Services, Inc. ("Tempo") made attempts to assert a mechanic's lien against the Property and filed a Complaint in the DC Superior Court (Case No. 2023-CAB-004257) against the Property for unpaid work Tempo did at the Property pre-receivership totaling $520,403.49 (the "Tempo Litigation"). On February 7, 2024, the Receiver filed his *Receiver's Motion to Stay State Court Litigations over Pre-Receivership Claim*, seeking issuance of an injunction enjoining and staying this matter based on the Receivership Order and the current cash and operational levels of the Receivership. On May 21, 2024, the Court issued its Order granting the Receiver's motion enjoining further action in the Tempo State Court litigation (the "Tempo Stay Order"). On June 11, 2024, the Receiver filed the Suggestion of Receivership Stay of Proceedings in the Tempo Litigation.

In addition to temporarily enjoining and staying continuation of Tempo Litigation, the Tempo Stay Order provided that the "Receiver shall address the continuing propriety of this

8

injunction in each of the regular status reports that it files with the Court." Given the current projected operational levels, the injunction provided for in the Tempo Stay Order is still needed at this time.

Dated: February 28, 2025

Respectfully submitted,

/s/Joshua W. Cox
Joshua W. Cox, No. 1033283
Bradley D. Jones, No. VA 68
Stinson LLP
1775 Pennsylvania Ave., N.W., Suite 800
Washington, D.C. 20006
Tel:  (202) 728-3023
Fax:  (202) 572-9943
joshua.cox@stinson.com
*Attorneys for Marc E. Albert, Receiver*

## Certificate of Service

I hereby certify that, on February 28, 2025, I filed the foregoing with the Court using the CM/ECF system, which will electronically serve all counsel of record who have entered an appearance in this case.

/s/ Joshua W. Cox
Joshua W. Cox

CORE/3528062.0002/196725417.1