IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL HOME LOAN MORTGAGE CORPORATION )<br>)<br>) | |
| Plaintiff,                                    ) | Case No. 1:23-cv-01642 |
| )                                              | |
| v.                                            ) | Judge Carl John Nichols |
| )                                              | |
| MM PROPERTY LLC, *et al.*                     ) | |
| )                                              | |
| Defendants.                                   ) | |
| )                                              | |

**RECEIVER'S OPPOSITION TO THIRD PARTY INTERVENOR TEMPO INC.'S MOTION TO LIFT STAY AND MEMORANDUM IN SUPPORT OF OPPOSITION**

Brad D. Jones, Receiver (the "Receiver"), by and through his undersigned counsel, hereby files the following Opposition ("Opposition") to the *Third-Party Intervenor Tempo Inc.'s Motion To Lift Stay* [Dkt. No. 102] (the "Tempo Lift Stay Motion") filed by Tempo, Inc., t/a Annapolis Painting Services ("Tempo"). The motion seeks to lift the litigation stay imposed by this Court's previously entered Order granting the Receiver's Motion to Stay. [Dkt. No. 70]. That order enjoined Tempo's efforts to obtain a mechanic's lien and continue litigation in the District of Columbia Superior Court matter, *Tempo, Inc. v. MM Property, LLC*, No. 2023-CAB-4257 (D.C. Super. Ct.)).

While progress has been made in stabilizing the ongoing operations at the Property, the Receivership still requires periodic cash infusions from other sources to maintain the post-receivership operations at the Property. Accordingly, the factual basis surrounding the previous implementation of the litigation stay enjoining Tempo's state-court action to assert collection mechanisms against the Property for pre-receivership debt remains. The Court should, therefore, deny the Tempo Lift Stay Motion and leave the current stay in place.

1

## **MEMORANDUM IN SUPPORT OF RECCEIVER'S OPPOSITON TO MOTION**

**Background**

1. This case was commenced on June 7, 2023 by the filing of a Complaint by Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Plaintiff") against the Defendants, MM Property LLC and MM Guaranty LLC (the "Defendants"). Scott Forrester ("Mr. Forrester") is a Principal of MM Property LLC, and MM Guaranty LLC [Dkt. No. 28 at 1], and the Defendants' authorized representative, [Dkt. No. 29 at 2, ¶2].

2. Freddie Mac filed its complaint, alleging a need "to avoid continuing harm that MM Property LLC ("Owner"), a defaulting borrower, is causing to a low-income, multi-family property in the District of Columbia known as Mayfair Mansions III (the "Property")." [Dkt. No. 1 at 1–2]. Plaintiff asserts the Property serves as collateral for a contractual loan obligation owed by the Owner to Freddie Mac. [Dkt. No. 1 at 2].

3. The Property is a 160-unit garden-style apartment complex located at 3743-3817 Jay Street NE, Washington, D.C. [Dkt. No. 3 at 1].

4. Simultaneously with the filing of the Complaint, Plaintiff filed a *Motion for Appointment of Receiver, Entry of Preliminary Injunction and Permanent Injunction*, which among other relief, sought the appointment of Marc E. Albert as receiver. [Dkt. No. 3 at 4].

5. On June 30, 2023, the Court entered a *Consent Order* [Dkt. No. 21], endorsed by Freddie Mac and the Defendants. Under the Consent Order, Marc Albert was appointed as Receiver to take control of and manage the Project.

6. Decretal Paragraph 15 of the Consent Order provided that, following appointment, the Receiver, and not the Defendants, would be responsible for addressing any claims or litigation concerning the Property or the Receivership Estate. [Dkt. No. 21 at 18, ¶15].

7. In relevant part, that paragraph of the Consent Order provided:

> The Receiver is authorized to initiate, defend, negotiate, settle, or otherwise dispose of any claim or litigation that concerns the Property, Owner or the Receivership Estate subject to Freddie Mac's approval to the extent such settlement shall affect Freddie Mac's security interests in the Property and all related Freddie Mac interests thereto. The Owner and members of Owner shall have the right, at their expense, to defend and respond to any claims that may be asserted against or by the Owner or members of Owner, subject to the right of Receiver to control any litigation that concerns the Property or the Receivership Estate. The Receiver and Owner shall reasonably cooperate with and make information available to each other in connection with any claims or litigation.

[Dkt. No. 21 at 18].

8. While the Consent Order allows for the Receiver's control over litigation against the receivership estate, it also is explicitly clear that the Receiver is only obligated to pay the ongoing operational expenses of the Receivership following its commencement on July 1, 2023. [Dkt. No. 21 at 15-17, ¶13]. With respect to pre-receivership debts and expenses, the Consent Order provides the following:

> The Receiver shall not be obligated to pay any Expenses incurred prior to the Commencement Date, except that the Receiver shall be authorized, in his discretion, to pay: (i) Expenses incurred and legally owed prior to the Commencement Date that are in the ordinary course of business and in accordance with normal periodic billing cycles, and/or (ii) other Expenses incurred and legally owed prior to the Commencement Date that the Receiver elects to pay in his discretion, in the interest of and for the benefit of the Property and the Receivership Estate, as long as such expenses have been reviewed to verify the legitimacy of the charges.

[Dkt. No. 21 at 15].

9. On September 30, 2024, the Court entered an *Amended Consent Order* [ECF Dkt. No. 80] (the "Amended Consent Order"), making minor changes to the previous Consent Order at the request of the Receiver. All provisions of the Amended Consent Order relevant to the Court's consideration of the present Motion were unchanged in the Amended Consent Order and remain in place.

3

10. On August 6, 2025, upon motion of the receiver Marc Albert, this Court entered its *Order Granting Motion to Substitute Receiver* [ECF Dkt. No. 98]. Under this order, Bradley D. Jones was substituted in for Mr. Albert as receiver for the Property effective August 15, 2025 under the terms of the previously entered Amended Consent Order, and Mr. Jones presently is serving in the capacity of the appointed Receiver under those terms.

11. On March 31, 2023, Tempo, Inc. t/a Annapolis Painting Services ("Tempo") filed a *Notice of Mechanic's Lien* with the District of Columbia Office of Tax and Revenue Recorder of Deeds claiming $520,403.39 in unpaid services and material costs for work completed at the Property during the period of December 2, 2022 through March 22, 2023 (the "Tempo Mechanic's Lien").

12. Subsequently, on July 13, 2023, Tempo filed its *Complaint to Enforce Mechanic's Lien and for Damages* (the "Tempo Complaint") in the Superior Court for the District of Columbia against MM Property, LLC, initiating Case No. 2023 CAB 004257 (the "Tempo Litigation"). The Tempo Complaint prayed for entry of an order enforcing Tempo's Mechanic's Lien and directing that the land and improvements at the Property not be sold unless the Mechanic's Lien is paid in full, as well as entry of a judgment against MM Property, LLC in the amount of $520,403.49 plus interest based on counts of Breach of Contract and Unjust Enrichment.

13. Following the Receiver being made aware of the Tempo Litigation, the Receiver (at the time, Marc Albert), filed his *Receiver's Motion to Stray State Court Litigation Over Pre-Receivership Claim* (the "Receiver Stay Motion") [ECF Dkt. No. 51], seeking a stay over the Tempo Litigation due to the provisions of the Consent Order prioritizing Receivership funds for the ongoing post-receivership expenses over payment of pre-receivership debts, and ensuring the limited funds of the Receivership could be utilized to ensure the health and safety of tenants at the

4

Property instead of being diverted to legal costs associated with the Tempo Litigation. Additional briefing on the subject was presented to the Court through an opposition to the Receiver Stay Motion filed by Tempo on February 29, 2024 [ECF Dkt. No. 60], a Reply to Tempo's opposition filed by the Receiver on March 14, 2025 (the "Receiver Reply") [ECF Dkt. No. 64], and a further response also in support of the stay filed by Freddie Mac on March 28, 024 [ECF Dkt. No. 68].

14. On May 21, 2024, the Court entered its *Order* (the "Stay Order") [ECF Dkt. No. 70] granting the Receiver Stay Motion and enjoining further action in the Tempo Litigation until further order of the Court.

15. On October 13, 2025, Tempo filed the present Tempo Lift Stay Motion, seeking to lift the previous litigation stay over the Tempo Litigation provided for in the Stay Order. Tempo argued that lifting the stay was appropriate as a result of a perceived lack of progress made by the Receiver in stabilizing the ongoing operations at the Property and alleged harm to Tempo due to its inability to pursue its mechanic's lien rights and take other collection efforts that may be available to it if the stay were to be lifted.

**I. Although progress has been made to improve stabilization of the property under the Receivership, many of the factors that existed at the time of entry of the Stay Order remain and justify the continued implementation of the litigation stay.**

16. Although the Receiver has made significant progress towards stabilizing and rehabilitating the Property under the Receiver's management, the majority of factors present at the time of implementation of the Stay Order continue to exist at the Property. In that respect, the Receiver, incorporates the justifications and legal support previously provided to the Court in the Receiver Stay Motion and Receiver Reply as if fully set forth herein.

17. In support of the Tempo Lift Stay Motion, Tempo argus that the Receiver has "failed to make any substantive progress to rehabilitate the Property." *See Tempo Lift Stay Motion*,

pg. 11, [ECF Dkt. No. 102]. To support this, Tempo points to allegedly *de minimus* improvements in actual vacancy rates at the Property, and Receiver's judgment to not fully rehabilitated seven "down units" at the Property—seven units largely stripped down to the studs present at the Property at the time the Receiver took possession. *Id.* These arguments, however, fail to capture the significant progress made by the Receiver to date with respect to the totality of circumstances of the Property and its stability.

18. While it is true that the *actual* vacancy rate at the Property has largely remained consistent since the implementation of the Stay Order, with actual occupied units typically hovering around 117 to 120 occupied units out of 160 (a rate of 25.0% to 26.9%), the Receiver has made significant strides in improving the *economic* vacancy rate for the Property over the same period—meaning the percentage of tenants actually paying rent at the Property. Upon taking possession over the Property, a very large portion of the occupying tenants were consistently paying little to no rent for their units at the Property. Throughout the Receivership, the Receiver and his property management team have worked to address and correct this issue through the available avenues under the District's housing laws. The Receiver employed landlord-tenant legal counsel and initiated legal proceedings against unpaying tenants in the D.C. Superior Court Landlord-Tenant Branch.

19. The status of unpaid rent by affordable housing tenants and the time it takes to adequately address such issues through eviction and other tenant collection suits in the District of Columbia have presently been described as reaching crisis levels, with the economic vacancy rates in the District presently among the highest in the country.[1] Obtaining final eviction over a non-

---

[1] For a discussion of these topics, See e.g. "DC landlords rally to change RENTAL Act to tackle eviction crisis and unpaid rent issues" Sept. 16, 2025 available at https://wjla.com/features/i-team/dc-landlords-rally-rental-law-eviction-crisis-rent-tenant-rights-evict-lease-violations-dc-council-small-multifamily-owners-association-dc-

paying tenant in the District of Columbia typically takes well over a year or more to obtain, often with no rent supplied by the tenant during this period nor the likelihood of collecting the unpaid rent owed by the tenant that caused initiation of the eviction suit in the first place.

20. The Receiver has worked to add more capable rent-paying tenants at the Property over the period since implementation of the Stay Order (itself a difficult and laborious process). This resulted in many incoming new tenants as well as an outflow of non-paying tenants from the Property. Thus, while the actual vacancy rates at the property have held fairly consistent (although recently improving), the overall financial health of the project is steadily improving, through significant increases in rent receipts. As an example, average rent collected near the time of entry of the Stay Order over April through June 2024 was $101,800.00 per month. But the same monthly period in 2025, saw average collections of $132,809.67, representing a 30.5% increase over the previous year. *Compare* Status Report [ECF Dkt. No. 84], Ex. D, pg. 1, *with* Status Report [ECF Dkt. No. 100], Ex. D, pg. 1.

21. In regard to the seven down units, the Receiver is not taking steps to rehabilitate these units at this time. But this represents a sound business judgment. The Receiver has been prioritizing using the available limited funds for ongoing operating costs and for use to make other vacant units ready to accept tenants as needed. This has allowed units to be brought online as new tenants are approved for move-in to the Property. It is appropriate to exhaust this supply of

---

mayomuriel-bowser*; see also* "RENTAL ACT REBALANCING EXPECTATIONS FOR NEIGHBORS, TENANTS, AND LANDLORDS ACT" February 12, 2025, District of Columbia Office of the Deputy Mayor for Planning and Economic Development presentation, available at
https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/RENTALAct2025.pdf (last accessed Oct. 27, 2025).

available units before expending the large capital improvement costs that would be needed to adequately bring the seven down units back online into rentable status[2].

22. Although progress has been made with respect to the stabilization of the Property and collected monthly rental income, it is true that the Receivership still is not operating at fully stabilized levels. The Receivership is still requiring periodic cash infusions through requests for funding from Feddie Mac through the Consent Order. The most recent request of the Receiver for additional funding occurred just last month, with the Receiver receiving $350,000 in additional funding from Freddie Mac for use at the property on September 16, 2025. *See* Status Report [ECF Dkt. No. 101] at pg. 5. These funds were largely used to pay the significant tax obligations and insurance costs related to the Property with some funds also being used to pay post-Receivership trade payables.

23. Preserving the status of the stay over the Tempo Litigation is still needed for the continued protection of the receivership estate *res*, judicial economy, and the "very real danger of litigation expenses diminishing the receivership estate." *United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 443 (3rd Cir. 2005); *See also S.E.C. v. Universal Financial*, 760 F.2d 1034, 1038 (9th Cir. 1985). Even given the challenging market facing the affordable housing rental market in the District, the best use of the limited funds of the Receiver still remains the use of such funds to continue the efforts to stabilize the Property for the benefit of all parties and to protect the health and safety of the tenants residing there in compliance with District law.

**II.   Allowing Tempo to pursue collections efforts outside of foreclosure would be similarly damaging to the Receivership Estate and should be prevented by leaving the existing stay in place.**

---

[2] Repairs to complete work for each down unit are expected to costs at least $50,000 each, for a total capital expense of at least $350,000. Additionally, due to the rising costs of construction materials since receiving this initial estimate, the costs to fully rehabilitate such units may now be considerably higher.

24. In the Lift Stay Motion, Tempo seemingly acknowledges the likelihood that, if it were to pursue its mechanic's lien foreclosure rights, doing so would be of little benefit to Tempo. Freddie Mac maintains a priority lien position which would likely absorb all potential foreclosure sale proceeds. *See* Tempo Lift Stay Motion [ECF 102], pg. 2 ("While Tempo's lien may not have priority, a judgment in the lien proceeding may allow Tempo to pursue post-judgment discovery against MM Property and its members to the extent Tempo does not recover from foreclosure proceedings."). Tempo, however, asks the Court to remove the litigation stay over its action, to allow for other collection efforts including seeking a personal judgment against the owner of the Property pursuant to D.C. Code § 40-303.20, and seeking post-judgment discovery that could potentially lead to supplemental claims for "alter ego liability, fraudulent conveyance, or the ability to pierce the veil of MM Property." Tempo Lift Stay Motion at p. 10.

25. The Receiver is concerned that the result of allowing this litigation to proceed will be to force Freddie Mac to exercise its foreclose rights on the Property and end the ongoing efforts to rehabilitate and stabilize the Property. Tempo's litigation and efforts to obtain a junior lien on the Property would attempt to encumber or control the *res* of the Receivership Estate and be disruptive to the Receivership.

26. First, with respect to the ability of Tempo to obtain a "personal judgment" against the owner of the premises as provided in D.C. Code § 40-303.20 in the event a foreclosure sale results in insufficient funds to satisfy a lien, the status of MM Property as a single asset real estate company, instead of an individual person, limit nearly all benefit to Tempo that this statute would provide. The assets of MM Property are limited to the Property itself and the rents that are derived therefrom, with such rents also serving as collateral for Freddie Mac's loans. In the event of foreclosure, all assets of MM Property would be used as payment towards Freddie Mac's priority

9

liens and MM Property would likely become a fully defunct entity rendering any "personal judgment" against the entity worthless. There is no *res* of the MM Property, now or in the future, that does not serve as part of the Receivership Estate.

27. Secondly, potential attempts to pursue post-judgment discovery against MM Property would also interfere with the Receivership Estate. The litigation costs associated with such discovery would be borne from the existing cash property of the Receivership Estate, which would require those costs to either be borne with additional funding by Freddie Mac, or if Freddie Mac was unwilling or able to inject such funding, force the Receiver to seek to terminate the Receivership. Instead of spending money on litigation, the Receivership funds and any continued support from Freddie Mac are better used to support the operation of the Property and its continued rehabilitation. To the extent that potential *alter ego* or other supplemental claims may be available to Tempo, such claims would only arise following such post-judgment discovery against MM Property with such litigation costs still borne by the Receivership Estate to its detriment.

WHEREFORE, the Court should allow the stay over the Tempo Litigation to remain in place to allow the Receiver to continue his efforts to stabilize the Property and allow for other potential opportunities allowing for termination of the Receivership to materialize. Tempo's motion should therefore be denied.

Dated: October 27, 2025											Respectfully submitted,

											*/s/ Joshua W. Cox*
											Bradley D. Jones, No. VA 68
											Joshua W. Cox, No. 1033283
											Stinson LLP
											1775 Pennsylvania Ave., N.W., Suite 800
											Washington, D.C. 20006
											Tel:  (202) 728-9903
											Fax:  (202) 572-9943
											brad.jones@stinson.com
											joshua.cox@stinson.com
											*Attorneys for Bradley D. Jones, Receiver*

## Certificate of Service

     I hereby certify that, on the 27th day of October 2025, I filed the foregoing with the Court using the CM/ECF system, which will electronically serve all counsel of record who have entered an appearance in this case.

											*/s/ Joshua W. Cox*
											Joshua W. Cox

11